# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| MEDIOSTREAM, INC. | § § § | |
| vs. | § | CASE NO. 2:08-CV-369-CE |
| | § § | |
| MICROSOFT CORPORATION, et al. | § | |

## MEMORANDUM OPINION AND ORDER

After considering the submissions and the arguments of counsel, the court issues the following order concerning the claim construction issues:

**I.    Introduction**

In this case, plaintiff MedioStream, Inc. contends that Defendants[1] infringe various claims of U.S. Patent No. 7,009,655 ("the '655 patent") and U.S. Patent No. 7,283,172 ("the '172 patent"). The patents cover software for the conversion of video to playback media standard formats and the authoring of this converted video to standard optical media such as DVDs, VCDs, and SVCDs. Some claims are written on the computer system while others are written on the method practiced by the system. Defendants are in the business of selling personal computers containing such software and/or the manufacture and sale of such software.

This memorandum addresses the parties' claim construction disputes. The memorandum will first briefly summarize the subject matter of the patents before addressing the merits of the parties' claim construction positions.

---

[1]Defendants include Microsoft Corporation, Acer America Corporation, Apple Computer, Inc., Dell, Inc., Gateway, Inc., Asus Computer International Inc., Sony Electronics, Inc., Cyberlink, Inc., Nero, Inc., Sonic Solutions, Cyberlink.com Corporation, Nero AG, and Sony Corporation.

## II.     Background of the Technology

The patents in suit relate to integrated software packages for computers capable of processing video and authoring it to media in standardized media formats such as DVD, VCD, and SVCD. Specifically, the patents in suit describe and claim an integrated solution for changing the video format, audio format, video size, and video frame rate of input video files so that input video of any format can be converted to standardized media formats.[2] The patents explain that prior to the invention this process was complicated and time-consuming, in part because of the incompatibility of programs used at various steps of the conversion and authoring process.[3]

The patents share a common abstract quoted below:

> A method for converting video information from an incoming format to an outgoing format using a process free from one or more intermediary files. The method includes receiving video information in a first format and receiving a desire output format based upon a first input and a desired TV standard based upon a second input. The method decodes the video information in the first format to raw video information in an uncompressed format and directly resizes the raw video information in the uncompressed format into a size associated with the desired output media format and the desired TV standard. The method adjusts the uncompressed format in the size associated with the desired output media format and the desired TV standard to a frame rate associated with the desired TV standard and encodes the uncompressed format in the size and the frame rate into an elementary video stream. A step of multiplexing the elementary video stream with audio information in the desired output media format and the desired TV standard to form video and audio information in a presentation format based upon the desired output media format and the desired TV standard is included.

---

[2]     '655 Patent, 3:9-22.

[3]     '655 Patent, 2:25-44.

Claim 1 of the '655 patent, an independent claim to a system for converting video information, contains many of the disputed terms and illustrates their use in the context of the claims:

> 1. A system for converting video information from an incoming format to an outgoing format using an integrated computer software application, the integrated computer software application being provided on one or more memories including:
>     a code directed to receiving video information in a first format;
>     a code directed to receiving a desired output media format based upon a first input;
>     a code directed to receiving a desired TV standard based upon a second input;
>     a code directed to converting the video information in the first format to raw video information an uncompressed format using a decoding process;
>     a code directed to resizing the raw video information in the uncompressed format into a size associated with the desired output media format and the desired TV standard;
>     a code directed to adjusting the uncompressed format in the size associated with the desired output media format and the desired TV standard to a frame rate associated with the desired TV standard;
>     a code directed to processing the uncompressed format in the size and frame rate into an elementary video stream; and
>     a code directed to processing the elementary video stream with audio information in the desired output media format and the desired TV standard to form video and audio information in a presentation format based upon the desired output media format and the desired TV standard.

Claim 1 of the '172 patent, an independent method claim for converting video information, illustrates the use of many of the disputed terms within the context of that patent's method claims:

> 1. A method for converting video information from an incoming format to an outgoing format using a continuous pass conversion process free from one or more intermediary files, the method comprising:
>     inputting video information in a first format;

> directly converting the video information in the first format to raw video information in an uncompressed format;
> inputting a desired output media format based upon a first input;
> inputting a desired video presentation standard based upon a second input;
> directly resizing the raw video information in the uncompressed format into a size associated with the desired output media format and the desired presentation standard;
> directly adjusting the uncompressed format in the size associated with the desired output media format and the desired video presentation format to a frame rate associated with the desired video presentation standard;
> directly processing the uncompressed format in the size and the frame rate into an elementary video stream; and
> directly processing the elementary video stream with audio information in the desired output media format and the desired video presentation standard to form video and audio information in a presentation format based upon the desired output media format and the desired video presentation standard.

### III. General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999) (quoting *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989)). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991)). Under the patent law, the specification must contain a written

description of the invention that enables one of ordinary skill in the art to make and use the invention. 35 U.S.C. § 112; *id.* at 978. A patent's claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. "For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Id*. "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994). This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)) (emphasis added). To that end, the words used in a claim "are generally given their ordinary and customary meaning." *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning

5

of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. *Id.* The patent is addressed to and intended to be read by others skilled in the particular art. *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. The Supreme Court stated long ago that "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id*. Nevertheless, the prosecution history is intrinsic evidence. *Id.* That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. *Id.* The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21 (quoting *Vitronics*, 90 F.3d at 1582). According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that "[t]he patent system is based on the proposition that the claims cover only the invented subject matter." *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a

word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. *Phillips*, 415 F.3d at 1322. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. *Id.* at 1317-19. In doing so, the court emphasized that claim construction issues are not resolved by any "magic formula." *Id.* at 1324. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. *Id.* at 1324.

## IV.     Agreed Terms

The parties have stipulated to the construction of the following terms:

- The parties agree that "multiplexing" means "combining." The term "multiplexing" is found in claim 9 of the '655 patent and claim 9 and 19 of the '172 patent.

- The parties agree that "multiplexing process" means "combining process." The term "multiplexing process" is found in claim 9 of the '655 patent and claim 9 and 16 of the '172 patent.

- The parties agree that "multiplexing the elementary video stream with audio information" means "combining the elementary video stream with audio information." The term "multiplexing the elementary video stream with audio information" is found in claim 9 of the '655 patent and claims 9 and 16 of the '172 patent.

- The parties agree that "video presentation standard" means "a standard for displaying video on television monitors." The term "video presentation standard" is found in claims 1, 16,

8

and 19 of the '172 patent.

## V. Disputed Terms

The parties dispute the construction of several terms relating to the structure and operation of the claimed invention. Additionally, for several terms both parties wish to use the plain meaning, but Defendants seek to require that steps happen in a specific order while Plaintiff suggests that those steps may occur in any order.

### A. "integrated computer software application"

- Plaintiff's proposed construction: "computer codes or instructions that are compatible and interoperate"

- Defendants' proposed construction: "one or more computer applications combined to create a single program"

The term "integrated computer software application" is found in claims 1 and 18 of the '655 patent and claims 16 and 18 of the '172 patent. The parties agree that this term, found in the preamble of the above claims, acts as a limitation on those claims because the patentee relied on the term to distinguish those claims over the prior art.

Plaintiff asks the Court to construe "integrated computer software application" as "computer codes or instructions that are compatible and interoperate." To support this position, Plaintiff points to the background of the invention which describes incompatibility as a "plague" in the field and that prior art methods have required the use of multiple incompatible applications to edit and convert video information.[4] The specification states that "the invention provides an integrated software

---
[4] '655 Patent, 2:25-44.

application" that can be installed on a personal computer.[5] The claims at issue also list a number of "codes directed to" various functions.

Defendants argue that mere compatibility or interoperability are not sufficiently limiting for this construction. Instead, they seek to construe "integrated computer software application" as "one or more computer software applications combined to create a single program." Defendants argue that although plaintiff's construction solves the "compatibility" problem mentioned in the background to the invention, it ignores the requirements of the prior art it describes as "complex," "time consuming," "taking up a large amount of memory," and requiring "a high degree of skill." Defendants argue that compatibility alone cannot satisfy the "integrated computer software application" and that the claim must be limited to "collections of computer programs" that "work as a unit."

Plaintiff's requested definition is too broad, and Defendants' may be misunderstood by a jury. Many modern computer programs are written as a collection of many smaller programs designed to work together and controlled by a master program or application. Defendants' definition captures this idea, but uses the terms "applications" and "program" in a way that may tend to confuse a jury. Additionally, the claims that contain this limitation also contain lists of "codes directed to" various functions and a definition that includes the term "code" will be clearer. The Court adopts "software codes or instructions that are compatible and operate as a unit" as the definition for "integrated computer software application." The plaintiff indicated during the claim construction hearing that the software must function as a unit. The Court's construction captures the requirement that the

---

[5] '655 Patent, 4:12-14.

integrated application be a single system or application.[6]

### B. "output media format"

- Plaintiff's proposed construction: "standard video format for optical disk"

- Defendants' proposed construction: "standard playback format for optical disk (e.g. DVD, VCD, SVCD)"

The term "output media format" is found in claims 1, 5, 6, and 10 of the '655 patent and claims 1, 5, 6, 10, 16, and 19 of the '172 patent. For example, in claim 1 of the '655 patent the claimed system receives from an input the desired output media format (e.g. a DVD, VCD or SVCD format) and then the invention resizes the video to that format before processing the video together with audio compatible with that output media format into an appropriate presentation format. The parties essentially agree that this term should describe the target format for the disk mastering program, but disagree as to how to describe that. Plaintiff wishes to construe this term as "standard video format for optical disk" while Defendants wish to construe this term as "standard playback format for optical disk (e.g. DVD, VCD, SVCD)."

In support of its "video" construction, Plaintiff points to the specification that lists only standard video media formats, such as DVD, VCD, and SVCD. The standards for each media type specify the acceptable video resolutions and codecs as well as acceptable audio bit rates and codecs.

Defendants wish to use "playback," as they believe "playback format" is a more precise definition of the formats contemplated by the patent. They argue that "playback format" would not create the confusion in the jury that "video format" would create when the claims contemplate the audio information that is associated with the video. At the claim construction hearing, Defendants

---

[6] See e.g. '655 patent 2:23-53.

expressed concern that "standard video format for optical disk" would confuse jurors because there are standards for optical disk that do not require video, such as DVD-R and DVD-RW. Defendants also expressed concern in their briefing that a jury may be confused by the lack of "audio" in this definition. Defendant has not provided any evidence that there exists a "standard video format for optical disk" that does not include audio, so the Court finds Defendants' concern overstated.

The "standard video format[s] for optical disk" include the DVD, VCD, and SVCD video playback standards. Because the parties agree that the patent is directed to standard video formats for optical disks and the specification supports that position,[7] the Court adopts "standard video format for optical disk" as the definition for "output media format."

### C. "[inputting/receiving] a desired output media format based upon the first input"

- Plaintiff's proposed construction: "[inputting/receiving] one from among multiple available output media formats based upon a first input"

- Defendants' proposed construction: "selecting one from among multiple available output media formats based on a first input"

Here, again, Plaintiff and Defendants largely agree. This claim term, found as "receiving" in claim 1 of patent '655 and claim 16 of the '172 patent and "inputting" in claims 1 and 19 of the '172 patent. Plaintiff proposes "[inputting/receiving] one from among multiple available output media formats based upon a first input" while Defendants propose "selecting one from among multiple available output media formats based on a first input."

As to the disputed term, Plaintiff relies on the language of the claims and does not offer

---

[7] '655 Patent, 8:40-47.

argument. Defendants argue that failure to use the term "selecting" in place of "inputting" or "receiving" would read the term "desired" out of the claim. Defendants fear that doing so would allow the claim to read on devices where the user has no choice of output media format. This argument is not supported by the remainder of the construction, which is agreed to read "one from among multiple available output media formats." Because the inputting/receiving or selecting must be of one from among multiple available media formats, the term "selecting" does not impose any limitation beyond inputting/receiving. Both require multiple available media formats, so Defendants' stated reason for the construction no longer applies. The inputting/receiving language better describes what each claim entails and thus will be preserved. Accordingly, the Court adopts Plaintiff's construction of "[inputting/receiving] one from among multiple available output media formats based upon a first input."

        D.        "[inputting/receiving ...] a desired video presentation standard based upon a second input"

- Plaintiff's proposed construction: "[inputting/receiving] one from among multiple available video presentation standards based upon a second input"

- Defendants' proposed construction: "selecting one from among multiple available video presentation standards based upon a second input"

As above, Plaintiff and Defendants have agreed on the construction of this term but for the distinction between "[inputting/receiving]" and "selecting." The parties agree that after the disputed term this phrase should be construed "one from among multiple available video presentation standards based upon a second input." Because the agreed portions of the construction resolve the problem argued in Defendants' response brief, and the inputting/receiving language better describes

13

what each claim entails without being confusing, the Court adopts Plaintiff's construction.

   **E.   "resizing"**

•      Plaintiff's proposed construction: "changing the size (width/height) of the video"

•      Defendants' proposed construction: "changing the frame size"

The term "resizing" is found in claims 1 and 12 of the '655 patent and claims 1, 12, 16, and 19 of the '172 patent. Plaintiff argues for a construction of "changing the size (width/height) of the video" while Defendants argue for "changing the frame size."

Plaintiff supports its construction by quoting from the specification. The specification states that "the method directly resizes the raw video information in the uncompressed format into a size associated with the desired output media format and the desired TV standard ..."[8] Plaintiff then points to a table in the specification that describes video size in pixel height and width (e.g. 720 x 480).[9] In arguing for its construction, Plaintiff emphasizes that the term must be read to allow resizing of both width and height.

Defendant's proposed construction of "frame size" attempts to specify that the "resizing" term refers to the height/width of the video rather than its length. In the briefing and again at the hearing, Defendants sought to distinguish between their construction and Plaintiff's construction by claiming Plaintiff's construction would allow changing the length of the movie. The Court does not share this view of Plaintiff's construction. Plaintiff's and Defendants' definitions are essentially identical in meaning, but Plaintiff's construction is more direct and better supported by the specification. The patents in suit do not use the term "frame size" but instead define the video frame

---

[8]      '655 Patent, 3:9-11.

[9]      '655 Patent, 8:40-47.

sizes by their height and width. Using Defendants' definition would require adding a term not found in the patent to the claims and then defining that term using the height and width language proposed by Plaintiff for "resizing." Because Plaintiff's proposed construction is well supported and the parties essentially agree that resizing refers to changing the height and width but not the length of the video, the Court adopts Plaintiff's definition of "changing the size (height/width) of the video" for the term "resizing."

### F. "presentation format based upon the desired output media format and desired [TV/video presentation] standard"

- Plaintiff's proposed construction: "the specific format for writing video and audio information to an optical disk for playback of the desired output media format using the desired TV standard [or video presentation standard]"

- Defendants' proposed construction: "a format for combined audio and video information based upon the output media format and the TV standard [or video presentation standard]"

This term appears in claims 1, 7, and 8 of the '655 patent and claims 1, 7, 8, 16, and 19 of the '172 patent. Plaintiff asks for a construction of "the specific format for writing video and audio information to an optical disk for playback of the desired output media format using the desired [TV/video presentation] standard." Plaintiff argues for its construction by pointing out that both the output media format and the TV or presentation standard determine how the video and audio information should be written to disk. In its briefing, Plaintiff also sought to add the limitation "recognized by a player" to this claim term but has since withdrawn that request. Plaintiff appears to be concerned that not including this term would not properly limit the scope of the claims to the formats that are part of the standard, such as the VOB format for DVD. Although the claim must

cover such formats,[10] importing that limitation from dependent claim 8 of the '655 patent would improperly limit the independent claim. Instead, the requirement that the presentation formats be "playback" formats used in standard players should be incorporated to distinguish "presentation format" from "output media format." The "to an optical disk" language is implied by the use of "output media format" which the parties agree implies an optical disk media. Additionally, the Court has construed "output media format" to be limited to standard video formats.[11]

Defendants are largely in agreement as to what this term should cover, but want to avoid importing limitations from the specification or the dependent claims. They agree that the format contemplated by the claim term is limited by the choice of output media and TV/presentation standard. Defendants also agree, based on their proposed construction of "output media format," that the presentation format must be a playback format.

Incorporating the definition for "output media format," the Court adopts "the playback format for video and audio information for the desired standard video format for optical disk using the desired TV standard [or video presentation standard]."

### G. "a code directed to"

- Plaintiff's proposed construction: "code or instructions that execute to carry out"

- Defendants' proposed construction: "software or firmware for"

The parties dispute as to this term echoes their dispute concerning the "integrated computer software application" claim term. This term is found in claims 1, 6, 14, 16, and 17 of the '655 patent and claims 16 and 17 of the '172 patent. Plaintiff's "code or instructions" construction mirrors the

---

[10]   Claim 8, which depends from claim 1, requires the presentation format of claim 1 be selected from the group consisting of VOB, VCD MPEG1, and SVCD MPEG2.

[11]   *See* V.B, *supra*.

"code or instructions" of its construction of "integrated computer software application." Defendants' "software or firmware" construction is more ambiguous relative to their proposed construction above. "Software or firmware" would also allow an "integrated computer software application" to include firmware rather than software, which is not supported by the intrinsic record. "Firmware" is completely absent from the patents. The patents describe using "software codes" to implement the disclosed functionality.[12]

Plaintiff also seeks to use the term "that execute to carry out" to link its code to the function performed by the code. Defendants seek to use "for." The term "carry out" is used to express the function of code in the specification.[13] In spite of this, "for" is less ambiguous and covers the same scope as Plaintiff's proposed construction of the term.

The Court therefore defines "a code directed to" as "software code or instructions for."

### H. "free from one or more intermediary files"

- Plaintiff's proposed construction: "without writing video to disk while processing the input video into the presentation format"

- Defendants' proposed construction: "such that at least one of the recited codes/steps does not create a file containing video information for use by another recited code/step"

At the claim construction hearing, the parties agreed to Plaintiff's construction of this term. Accordingly, the Court adopts Plaintiff's definition for "intermediary files."[14]

---

[12] '655 Patent, 12:12-13.

[13] '655 Patent, 12:12-13.

[14] The thrust of the invention as it relates to this limitation is that the source compressed video is never saved as an uncompressed or "raw" video file during the conversion process. Doing so would require inordinate amounts of storage space, so the source is uncompressed and converted in small chunks that are then converted into the destination format. The Court adopts

17

### I. Ordering of resizing, changing frame rate

- Plaintiff's proposed construction: claims do not require resizing to be performed prior to changing the frame rate

- Defendants' proposed construction: claims require resizing to be performed prior to changing the frame rate

The issue of ordering the resizing and frame rate steps arises in claim 1 of the '655 patent and claims1, 16, and 19 of the '172 patent.

In claim 1 of the '655 patent and claim 16 of the '172 patent, the frame rate change limitation calls for "a code directed to adjusting the uncompressed format in the size associated with the desired output [to the appropriate frame rate.]" This limitation follows the limitation calling for a code directed to resizing the video file. The frame rate limitation requires the resizing to have been completed, so the frame rate code must operate on the uncompressed format after the resizing code.

In claims 1 and 19 of the '172 patent, a method claim, the limitation for frame rate change follows and refers to the limitation for resizing. Grammatically, resizing must occur before the change in frame rate.

In the specification, the only figure addressing both resizing and frame rate conversion have the resizing occurring first in a separate block.[15] The other figures that would include either the resizing or frame rate conversion steps include them in the same functional block, but describe the

---

Plaintiff's construction with the understanding that the final presentation format may be written to disk as a file during the conversion process. While this file is written to disk, it is not an intermediary file.

[15] '655 patent, Figure 4.

resizing as occurring prior to changing the frame rate.[16] The sole support for any order other than the resizing occurring before the frame rate change is that "one of ordinary skill in the art would recognize many other limitations, variations, and modifications."[17] The grammar of the claims and the discussion of these steps in the specification require a specific order. Accordingly, the Court construes these claims to require resizing of the video before changing its frame rate.

The Court notes that the parties agreed at the claim construction hearing that the resizing/frame rate order does not require the entire source video file to be converted into an uncompressed video file and resized prior to changing the frame rate. Rather, each piece of the video must be resized before the frame rate for that part of the video is changed.

## VI. Conclusion

The court adopts the constructions set forth in this opinion for the disputed terms of the '655 and '172 patents. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

---

[16] '655 Patent, Figures 1, 2, and 7. Figure 1 depicts the prior art. Figures 2 and 7 are generic and do not address either frame rate or resizing specifically. The descriptions of Figures 2 and 7 in the specification has the same grammatical dependence as the claims. '655 Patent, 6:48-54; 10:57-63.

[17] '655 Patent, 8:27-28.

SIGNED this 27th day of August, 2010.

                                             _____
                                             CHARLES EVERINGHAM IV
                                             UNITED STATES MAGISTRATE JUDGE